**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GEORGE HUERTA, an individual, on behalf of himself and all others similarly situated and as a representative plaintiff,<br><br>*Plaintiff-Appellant*,<br><br>v.<br><br>CSI ELECTRICAL CONTRACTORS, INC.,<br>*Defendant-Appellee*,<br><br>and<br><br>FIRST SOLAR, INC.; CALIFORNIA FLATS SOLAR LLC; CA FLATS SOLAR 130, LLC; CA FLATS SOLAR 150, LLC; CAL FLATS SOLAR CEI, LLC; CAL FLATS SOLAR HOLDCO, LLC; MILCO NATIONAL CONSTRUCTORS, INC.; CALIFORNIA COMPACTION CORPORATION,<br>*Defendants*. | No. 21-16201<br><br>D.C. No.<br>5:18-cv-06761-BLF<br><br><br>ORDER CERTIFYING QUESTIONS TO THE SUPREME COURT OF CALIFORNIA |

Filed July 8, 2022

Before:  Sandra S. Ikuta, Jacqueline H. Nguyen, and
John B. Owens, Circuit Judges.

Order

## SUMMARY[*]

### California Law

The panel certified to the Supreme Court of California the following questions:

>   (1) Is time spent on an employer's premises in a personal vehicle and waiting to scan an identification badge, have security guards peer into the vehicle, and then exit a Security Gate compensable as "hours worked" within the meaning of California Industrial Welfare Commission Wage Order No. 16?

>   (2) Is time spent on the employer's premises in a personal vehicle, driving between the Security Gate and the employee parking lots, while subject to certain rules from the employer, compensable as "hours worked" or as "employer-mandated

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

travel" within the meaning of California Industrial Welfare Commission Wage Order No. 16?

(3) Is time spent on the employer's premises, when workers are prohibited from leaving but not required to engage in employer-mandated activities, compensable as "hours worked" within the meaning of California Industrial Welfare Commission Wage Order No. 16, or under California Labor Code Section 1194, when that time was designated as an unpaid "meal period" under a qualifying collective bargaining agreement?

## ORDER

We respectfully ask the Supreme Court of California to exercise its discretion to decide the certified questions set forth in section II of this order.

## I. Administrative Information

We provide the following information in accordance with California Rule of Court 8.548(b)(1). The caption of this case is:

No. 21-16201

GEORGE HUERTA, an individual, on behalf of himself and all others similarly

situated and as a representative plaintiff, Plaintiff-Appellant,

v.

CSI ELECTRICAL CONTRACTORS, INC., Defendant-Appellee

and

FIRST SOLAR, INC.; CALIFORNIA FLATS SOLAR LLC; CA FLATS SOLAR 130, LLC; CA FLATS SOLAR 150, LLC; CAL FLATS SOLAR CEI, LLC; CAL FLATS SOLAR HOLDCO, LLC; MILCO NATIONAL CONSTRUCTORS, INC.; CALIFORNIA COMPACTION CORPORATION, Defendants.

The names and addresses of counsel for the parties are:

For Plaintiff-Appellant George Huerta: Lonnie C. Blanchard, III, 177 E Colorado Boulevard, Pasadena, CA 91105; Peter R. Dion-Kindem, The Dion-Kindem Law Firm, 2945 Townsgate Road, Suite 200, Westlake Village, CA 91301.

For Defendant-Appellee CSI Electrical Contractors, Inc.: Daniel Benjamin Chammas and Min Kyung Kim, Ford & Harrison, LLP, 350 S Grand Avenue, Suite 2300, Los Angeles, CA 90071.

As required by Rule 8.548(b)(1), we designate George Huerta as the petitioner if our request for certification is granted.  He is the appellant before our court.

## II. Certified Questions

We certify to the Supreme Court of California the following three questions of state law that are now before us:

(1) Is time spent on an employer's premises in a personal vehicle and waiting to scan an identification badge, have security guards peer into the vehicle, and then exit a Security Gate compensable as "hours worked" within the meaning of California Industrial Welfare Commission Wage Order No. 16?

(2) Is time spent on the employer's premises in a personal vehicle, driving between the Security Gate and the employee parking lots, while subject to certain rules from the employer, compensable as "hours worked" or as "employer-mandated travel" within the meaning of California Industrial Welfare Commission Wage Order No. 16?

(3) Is time spent on the employer's premises, when workers are prohibited from leaving but not required to engage in employer-mandated activities, compensable as "hours worked" within the meaning of California Industrial Welfare Commission Wage Order No. 16, or under California Labor Code

> Section 1194, when that time was
> designated as an unpaid "meal period"
> under a qualifying collective bargaining
> agreement?

Our phrasing of these questions should not restrict the California Supreme Court's consideration of the issues involved; that court may reformulate the questions. Cal. R. Ct. 8.548(f)(5).

We agree to accept and to follow the decisions of the California Supreme Court. *Id.* 8.548(b)(2); *see also Frlekin v. Apple, Inc.*, 870 F.3d 867, 869 (9th Cir. 2017) ("[W]ith respect to a certified question, . . . the Ninth Circuit is bound by the California Supreme Court's interpretation of California law." (citation omitted)).

### III. Statement of Facts

This case comes from a construction site at the California Flats Solar Project ("the Project"), a solar power facility in Monterey County, California, located on private property called Jack Ranch. The owner of the facility, First Solar Electric, Inc., retained CSI Electrical Contractors ("CSI") for "procurement, installation, construction, and testing services on Phase 2 of the Project."

Appellant George Huerta worked for CSI through the subcontractor Milco National Constructors, Inc. Two collective bargaining agreements ("CBAs") governed his employment: the Operating Engineers Local Union No. 3 of the International Union of Operating Engineers, AFL-CIO's CBA, and the Project Labor Agreement specific to the Project.

For the Project, First Solar Electric was required to obtain and follow an Incidental Take Permit ("ITP") from the California Department of Fish and Wildlife, which imposed specific rules regarding the presence of local endangered species. The CBA required workers to comply with the permit. The ITP imposed speed limits and other restrictions on the work site. A biologist also monitored the site to minimize disturbances to the species' habitats and cleared the road each morning before anyone could enter.

Workers commuted to the site via personal vehicles, carpools, and buses. The Project had one entrance, requiring workers to first pass a guard shack at the entrance, and then to stop at the Security Gate several miles down the road. Sometimes workers waited outside the entrance before the sun rose or the road was cleared by the biologist.

After passing through the entrance, CSI workers stopped at the Security Gate miles down the road, where a guard scanned each worker's badge and sometimes peered inside vehicles or truck beds. CSI told workers that the Security Gate was the first place they "were required to be at the beginning of the day in order to work." The same badging-out process at the Security Gate was used to exit the site. Since many workers exited the Project around the same time each day, lines at the Security Gate often were five to twenty minutes long.

On their way to work, once through the Security Gate, employees drove ten to fifteen more minutes to the parking lots down the road. On the drive, they had to follow various rules and restrictions regarding speed limits and passing; prohibitions on smoking, gambling, drinking, using drugs or firearms, and creating dust; and general precautions about the endangered species. CSI told workers that noncompliance could result in suspension or termination.

CSI also informed workers they "were required to stay on the job Solar Site during the entire workday" including "during [their] meal periods."

The district court granted CSI's first motion for partial summary judgment on April 28, 2021, and its second on June 25, 2021. The district court ruled that CSI's requirements that workers undergo the exit process and drive between the Security Gate and the parking lots before and after each shift did not rise to the level of control sufficient to require compensation. The district court also determined that the Security Gate was not the "first required location" as defined by Wage Order No. 16, and that Huerta's meal period claims were statutorily exempted because he worked under a qualifying CBA. The district court relied on its decisions in two earlier class actions arising from the same site. *See Griffin v. Sachs Elec. Co.*, 390 F. Supp. 3d 1070 (N.D. Cal. 2019), *aff'd*, 831 F. App'x 270 (9th Cir. 2020) (unpublished); *Durham v. Sachs Elec. Co.*, No. 18-cv-04506-BLF, 2020 WL 7643125 (N.D. Cal. Dec. 23, 2020).

The parties stipulated to the judgment, which reserved Huerta's right to appeal. Huerta timely appealed to our court.

## IV. Explanation of Certification Request

No controlling California precedent has answered the certified questions presented here. These questions are dispositive in this case and have significant public policy implications for California workers and employers.

### A. Exit Process

California law provides no clear answer to the certified question of whether California Industrial Welfare

Commission Wage Order No. 16 requires compensating workers for time spent on the employer's premises in a personal vehicle, waiting to scan an identification badge, permit security guards to peer into the vehicle, and exit a Security Gate.[1]  Wage Order No. 16 provides that employers must pay employees for all "hours worked," which is defined as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so."  Wage Order 16 §§ 2(J), 4(A).  The California Supreme Court has held the two prongs are "independent factors, each of which defines whether certain time spent is compensable as 'hours worked.'"  *Frlekin v. Apple*, 457 P.3d 526, 531 (Cal. 2020) (quoting *Morillion v. Royal Packing Co.*, 995 P.2d 139, 143 (Cal. 2000)).

Huerta argues that this "mandatory exit security process" constitutes "hours worked" under both the "control" prong, and the "suffer or permit" prong, of Wage Order No. 16.  On appeal, he specifically challenges the waiting time and security process only upon exit from, not entry to, the site.  CSI refers to this time merely as "time exiting the project," and contends the time is not compensable under the "control" prong because of the standard from *Frlekin*, and does not constitute hours worked under the "suffer or permit" prong due to the rule in *Hernandez v. Pacific Bell Telephone Co.*, 239 Cal. Rptr. 3d 852, 860 (Ct. App. 2018).

---

[1] Wage Order No. 16 regulates the wages, hours and working conditions in certain on-site occupations in the construction, drilling, logging, and mining industries.

### 1. "Control" Prong

The California Supreme Court in *Frlekin* clarified the "determinative" question for the "control" prong is the level of control, "rather than the mere fact that the employer requires the employees' activity." 457 P.3d at 533, 538 (quoting *Morillion*, 995 P.2d at 146). For "*onsite* employer-controlled activities," whether the activity is required is relevant but not dispositive; courts also consider additional relevant factors "including, but not limited to, the location of the activity, the degree of the employer's control, whether the activity primarily benefits the employee or employer, and whether the activity is enforced through disciplinary measures." *Id.* at 538. But the analyses and weight given to the factors differ slightly when addressing, for example, on-site security exit processes, *see id.*, and mandatory on-call time on the employer's premises, *see, e.g.*, *Mendiola v. CPS Sec. Sols., Inc.*, 340 P.3d 355 (Cal. 2015). The analyses and weight also differ when addressing the employee's travel time off the employer's premises, such as travel to and from the employer's premises on employer-mandated transportation, *Morillion*, 995 P.2d at 140, and travel to and from the employer's premises on employer-provided optional transportation, *Overton v. Walt Disney Co.*, 38 Cal. Rptr. 3d 693, 699–701 (Ct. App. 2006); *Hernandez*, 239 Cal. Rptr. 3d at 856–59. And no California court has addressed which iteration of the control analysis applies to time spent on the employer's premises, in a personal vehicle, waiting for and undergoing an exit process.

The *Frlekin* factors provide guidance, but no clear answer. Like the bag check in *Frlekin*, the process here was required to exit, and in both cases the process occurred on the employer's premises and primarily benefitted the

employer.**2**   However, the disciplinary measures here were less extensive than those in *Frlekin*.**3**   And the overall degree of control seems lower than in *Frlekin*, where the employer compelled workers to "perform specific and supervised tasks while awaiting and during the search," like finding and waiting for an available manager or guard to conduct the search, opening all bags and packages and moving items inside, presenting personal technology for inspection, and "providing a personal technology card for device verification."   457 P.3d at 531.   While Huerta and his colleagues could also wait for up to twenty minutes to exit, he merely had to roll down his window and present his badge, and it is not clear that guards always looked into car windows or truck beds, or that this caused delays or required workers to take any action.

California case law concerning employer control, and factors such as whether the control is exerted on or off the employer's site, provides further guidance, but again no clear answer.   The control exerted by the employers in *Morillion* and *Mendiola*—which the California Supreme

---

**2** The *Frlekin* exit searches "promote[d] [the employer's] interest in loss prevention."   457 P.3d at 535.   While CSI argues the exit process was "strictly for the purposes of ingress and egress," the record supports that the purpose was theft prevention, and it is reasonable to infer CSI also intended to promote security and compliance with the environmental restrictions.

**3** Compared to the extensive written discipline policy in *Frlekin*, 457 P.3d at 536, including and up to termination for failure to undergo an exit search, here workers without badges could exit by obtaining clearance from the security guard shack.   While workers could be disciplined or terminated if they twice attempted to exit the Security Gate "too early at the end of the workday," this was because early arrival indicated workers were speeding on the internal roads, and so discipline was unrelated to the exit process.

Court deemed sufficient to require compensation—seems comparatively greater than that exerted here. In *Morillion*, 995 P.2d at 140–41, workers were required to travel on employer-provided buses from off-site meeting points to the employer's premises, so the employees were off-site but under the employer's control. In *Mendiola*, 340 P.3d at 357–58, workers were restricted from leaving the premises during on-call periods and required to immediately respond to activated alarms, though not required to take other actions, so the employees were on-site and under the employer's control (because they were on-duty and required to stay on site). The California Court of Appeal in *Overton*, 38 Cal. Rptr. 3d at 699–701, emphasized that the mandatory nature of the transportation was critical in making off-site travel time compensable (though *Frlekin*, 457 P.3d at 538, stated that the mandatory nature was a non-dispositive factor for security exit processes). In comparison, Huerta could be in his personal vehicle, but was required to go through the Security Gate to leave the job site, and was on the employer's premises until he exited the Security Gate, which meant he was necessarily prevented from performing personal errands until he exited the Gate and left the employer's premises.

As this case contains elements of the *Frlekin* security process and the *Morillion* and *Overton* transportation requirements, but does not fit neatly into either set of cases, we are uncertain whether CSI exerted sufficient control over Huerta for his time spent related to the exit process to constitute "hours worked" under Wage Order No. 16. Although Huerta was required to be on-site (and under some degree of employer control) until he exited the employer's premises, he was in his personal vehicle, and the degree of employer control was not substantial. And the consequence of any interpretation of the Wage Order could significantly

impact employers and employees throughout California that require workers to badge into or out of worksites, buildings, parking garages, or other locations.

## 2.  "Suffer or Permit" Prong

Huerta also argues that the time spent waiting for and undergoing the exit process was compensable as "hours worked" under the "suffer or permit" prong of Wage Order No. 16.  Under California law, "an employee who is *suffered or permitted to work* does not have to be under the employer's control to be compensated, provided the employer has or should have knowledge of the employee's work."  *Frlekin*, 457 P.3d at 531 (first citing *Morillion*, 995 P.2d at 144–45; then citing *Troester v. Starbucks Corp.*, 421 P.3d 1114 (Cal. 2018); and then citing *Hernandez*, 239 Cal. Rptr. 3d at 856).  The "phrase 'suffered or permitted to work, whether or not required to do so' . . . encompasses a meaning distinct from merely 'working.' . . . [It] can be interpreted as time an employee is working but is not subject to an employer's control."  *Morillion*, 995 P.2d at 145.  And "a benefit is neither a necessary nor a sufficient condition for liability under the 'suffer or permit' standard.  Instead . . . , the basis of liability is the defendant's knowledge of and *failure to prevent* the work from occurring."  *Martinez v. Combs*, 231 P.3d 259, 282 (Cal. 2010).

The California Supreme Court has never explicitly defined "work" in the phrase "suffer or permit to work" or issued an opinion that squarely addresses the question.  *Cf. id.* at 273–74, 282 (discussing the history of the phrase and its interaction with employer control); *Dynamex Ops. W. v. Super. Ct.*, 416 P.3d 1, 32 (Cal. 2018) (discussing how the phrase impacted the definition of independent contractor).

The California Court of Appeal has held "the standard of 'suffered or permitted to work' is met when an employee is engaged in certain tasks or exertion that a manager would recognize as work.  Mere transportation of tools, which does not add time or exertion to a commute, does not meet this standard."  *Hernandez*, 239 Cal. Rptr. 3d at 860 (quoting *Taylor v. Cox Commc'ns Cal., LLC*, 283 F. Supp. 3d 881, 890 (C.D. Cal. 2017)).

Here, Huerta was a forklift operator, and there is no record evidence suggesting his manager would recognize driving his personal vehicle, rolling down his window, or scanning his identification badge as "work."  He does not contest these were the only required activities, but instead argues they met the legal standard because he had to literally exert himself to do so.

However, the California Supreme Court has never explicitly adopted this definition and we are uncertain if it would.  The answer would be dispositive here if decided in Huerta's favor, so we respectfully certify this question.

## B.  Drive Time

No controlling California precedent has answered the certified question of whether Wage Order No. 16 requires compensating workers for time spent driving between the entrance/exit of the employer's premises and the location where the shift begins/ends.  Though the time spent driving between the employee parking lots and the Security Gate blends into the time spent waiting for the exit process, CSI's control differed between the drive time and the exit process, and Huerta's theory of liability is also distinct.

### 1. "Control" Prong

Huerta argues he should be paid for the "drive time" between the Security Gate and the employee parking lots as "hours worked" under the "control" prong of Wage Order No. 16, as he was required to be on the employer's premises, could not use the time for his own purposes, and was subject to CSI's rules on the road. CSI contends that the relevant question is the level of control, not whether workers could use the time for their own purposes, and that enforcing rules on the road does not rise to a compensable level of control.

Several of the *Frlekin* control factors favor Huerta: The drive occurred on CSI's premises and the rules were enforced through disciplinary measures, including termination, and while the drive itself benefitted both the employee and employer, the rules—including bans on speeding, smoking, drinking, wearing headphones, and other activities—benefitted the employer.

California cases concerning off-premises transportation are instructional here. Employers "control" drive time by requiring workers to use employer-provided transportation. *Compare Morillion*, 995 P.2d at 146–47, *with Hernandez*, 239 Cal. Rptr. 3d at 856–59 *and Overton*, 38 Cal. Rptr. 3d at 697–99; *see also Frlekin*, 457 P.3d at 534 ("[I]n the commute context, an employer's interest generally is limited to the employee's timely arrival. . . . [U]nless the employer *compels* the employee to use a certain kind of transportation or employer-provided transportation, it would be, without more, unreasonable to require the employer to pay for travel time."). In *Morillion*, for example, the time spent waiting for and riding on the employer-mandated buses constituted compensable "hours worked" under the relevant wage order because the employer exerted control by "determining when, where, and how [workers] are to travel." 995 P.2d at 147.

The employer in Huerta's case did not exert a similar time of control:  Huerta used his own vehicle, and other workers carpooled with colleagues or took a bus, and the rules he had to follow fundamentally differ from the requirement to ride in an employer's vehicle.[4]  On the other hand, this is not an off-site transportation case:  Huerta was required to be on the employer's premises while he was traveling from the Gate to the parking lot, a fact that weighs in favor of the conclusion that he was under his employer's control.  *See Frlekin*, 457 P.3d at 531 (indicating that employees were under the employer's control while awaiting an exit search in part because the employer "confines its employees to the premises as they wait for an undergo an exit search"); *cf. Bono Enters., Inc. v. Bradshaw*, 38 Cal. Rptr. 2d 549, 553–54 (Cal. App. 1995), *disapproved on other grounds by Tidewater Marine Western, Inc. v. Bradshaw*, 927 P.2d 296 (Cal. 1996) ("When an employer directs, commands or restrains an employee from leaving the work place during his or her lunch hour and thus prevents the employee from using the time effectively for his or her own purposes, that employee remains subject to the employer's control.").

California intermediate courts distinguish *Morillion* and employer-mandated off-site transportation from employer-provided optional off-site transportation, where employers do not exert sufficient control because workers have choices in their commutes.  *See Hernandez*, 239 Cal. Rptr. 3d at 856–59; *Overton*, 38 Cal. Rptr. 3d at 697–99.  Huerta argues CSI controlled the drive time between the Security Gate and the employee parking lots because he was on the employer's

---

[4] Some of the rules impose restrictions similar to ordinary traffic laws, which make the drive resemble non-compensable commute time more than employer-mandated travel.  *See Frlekin*, 457 P.3d at 534 ("Commuting . . . is not generally compensable.").

premises, and therefore could not run errands or pick up his children. *See Morillion*, 995 P.2d at 146. But this argument is undermined by *Hernandez*, which determined that employers did not control drive time in optional employer-provided vehicles even when workers were required to carry the employer's equipment and were not permitted to run errands or make other stops. 239 Cal. Rptr. 3d at 858–59. Indeed, while the *Hernandez* workers were fully precluded from non-work-related errands on their entire commute, Huerta could have done those things on the rest of his commute aside from the stretch between the Security Gate and the employee parking lots—but Huerta is claiming only that time spent on the stretch between the Gate and the lot qualifies as "hours worked."

In *Overton*, employees who drove to work were required to park in lots far from the job site, but the time spent on optional shuttles from the parking lot to the job site—time apparently not spent on the employer's premises—was not compensable, as personally driving to work was voluntary (vanpools and buses were available) and use of the shuttles was not mandatory (they could walk or bike). 38 Cal. Rptr. 3d at 699–701. The facts here distinguishable because the entire travel time occurs on the employer's premises and Huerta had no option other than to travel on the employer's premises from the Security Gate to the parking lot of the job site. Even if the arrival to the lot in *Overton* parallels Huerta's arrival to the Security Gate as the first entry onto the employer's premises, in Huerta's case he had no option other than arriving at the Gate, whereas the *Overton* employees could arrive directly at their jobsite entrance. *See id.* at 695. For the same reason, the travel time between the lot and jobsite in *Overton* is distinguishable from the travel time between the Gate and jobsite here. And the *Overton* court rejected the suggestion to move the time clock to

badge-in at the parking lot as it would result in the employer "paying unnecessary compensation to many of its employees," including those that walked or biked from the lot to the site. *Id.* at 701. But even though the travel from the parking lot to the job site was not compensable given that an employee could choose to not make the trip, *Overton* does not preclude Huerta's similar drive time claim because he had no choice but to drive from the Gate to his jobsite.

Yet the California Supreme Court has not decided the specific issue of whether driving on an employer's premises, in a personal vehicle, before or after a shift, while subjected to an employer's rules, is compensable as "hours worked" under the control prong of the wage order, so we are unsure if the time is compensable. Because interpreting the wage hour to favor either party could significantly increase or decrease California employers' liability for compensating workers when they are on an employer's premises, we respectfully certify this question for review.

## 2. "Employer-Mandated Travel" and "First Location" Under Section 5

Wage Order No. 16 Section 5(A) states, "All employer-mandated travel that occurs after the first location where the employee's presence is required by the employer shall be compensated at the employee's regular rate of pay or, if applicable, the premium rate . . . ."

The California Supreme Court has never defined "first location" or "employer-mandated travel" in Wage Order No. 16 Section 5and it appears this is the only wage order that includes this travel language. Therefore, we do not know if the Security Gate is the "first location" in this case. The California definition of "compulsory travel time" from *Morillion* may apply to and define "employer-mandated

travel" in Wage Order No. 16, as the legislative history of the wage order cited *Morillion*.[5]    Also, the hearing discussing the passage of the wage order explicitly referenced "protect[ing] worker[s] from being seesawed between job sites . . . where they may be told to report to a particular job site, and then, after performing particular work there, being told to go to a secondary job site, and as a result, not being paid for the employer-controlled travel in between," and also protecting workers who "have to park off-site and be bused into the job sites," both of which are encompassed by the *Morillion* definition.[6]  But as discussed above, it is not entirely clear that *Morillion* precludes compensating workers for the drive time, wait time, and badging time, so defining "first location" and/or "employer-mandated travel" could be dispositive for this issue.

Huerta specifically contends the Security Gate was the "first location" the employer required him to be, and therefore the travel to and from that location was employer-mandated, not because he had to badge in but rather because managers told workers they had to go through the Gate before starting their shifts.  It is true that there was at least a de facto required arrival time to be at the Gate for entry and exit:  Workers had to sign in at the parking lots before their shift started; there was a strictly enforced speed limit on the only road between the Gate and parking lot; CSI knew how long the drive took; the Gate did not open until a certain time

---

[5] *Statement As to the Basis for Wage Order No. 16 Regarding Certain On-Site Occupations in the Construction, Drilling, Mining, and Logging   Industries*, at 10. https://www.dir.ca.gov/iwc/StatementAsTo TheBasisWageorder16.pdf.

[6] *Public Hearing, Department of Industrial Relations Industrial Welfare Commission*, Sept. 21, 2000 (statements of Scott Wetch and Jerry Haft), https://www.dir.ca.gov/iwc/PUBHRG9211.htm.

each morning; and CSI "gave workers a scheduled time when [they] could enter" the site, which sometimes was delayed; which taken together indicates CSI and the workers knew the Gate arrival time was de facto required for workers to begin or end their shifts on time.

But de facto arrival times do not always signify that the drive was employer-mandated, compensable travel. Standard commutes need not be compensated in California, *see Frlekin*, 457 P.3d at 534, during which there are always de facto required arrival times for locations unrelated to the employer. For example, a worker might have to arrive at a public toll plaza by 7:00 a.m. if she hopes to miss traffic and arrive at the office by 7:30 a.m., but we do not think that means the commute from the toll plaza to the office is compensable. By contrast, Huerta might have had to arrive at such a public toll plaza by 7:00 a.m. in order to arrive at the employer's premises—i.e., the Security Gate—by 7:30 a.m. and at his worksite by 8:00 a.m. And *Overton* cuts against Huerta's theory of liability because, while the opinion did not discuss Section 5(A), the California Court of Appeal did not seem to think the travel from the parking lot to the job site was compensable merely because an employee had to make the trip once parked. On the other hand, employees in *Overton* had the option of reporting directly to the employee entrance, while Huerta had to report to the Security Gate.

But because no court has specifically defined Section 5(A), California courts broadly construe wage orders to protect workers, *see Mendiola*, 340 P.3d at 359, and this question would be dispositive if decided in Huerta's favor, we respectfully request that the California Supreme Court answer this certified question.

## C.  Meal Periods

Finally, no controlling California precedent has answered the certified question of whether Wage Order No. 16 or California Labor Code Section 1194 requires compensating workers for time spent on the employer's premises, when workers are prohibited from leaving but not required to engage in employer-mandated activities, and that time is designated as an unpaid "meal period" under a qualifying collective bargaining agreement.  The answer to this question would dispositively address Huerta's meal period claim.

California law requires employers to pay workers minimum wage, "[n]otwithstanding any agreement to work for a lesser wage."  Cal. Lab. Code § 1194; *see also* Cal. Lab. Code § 1182.12; IWC Wage Order 16 §§ 2, 4 (requiring minimum wage for all "hours worked").  California law also requires providing workers thirty-minute meal periods, subject to certain exceptions.  Cal. Lab. Code § 512(a).  California courts have stated the Labor Code requires that the meal periods be paid if work is required, which includes when workers cannot leave the employer's premises (i.e. an on-duty meal period).  *See, e.g.*, *Brinker Rest. Corp. v. Super. Ct.*, 273 P.3d 513, 532–35 (Cal. 2012) (discussing the historical legal basis for off-duty meal period requirements, including ensuring employees "are free to leave the premises"); *Bono Enters., Inc.*, 38 Cal. Rptr. 2d at 556 (supporting the interpretation of the wage order to require "an employer to pay an employee for meal periods during which the employee is precluded from leaving the worksite"); *Madera Police Officers Ass'n v. City of Madera*, 682 P.2d 1087, 1088 (Cal. 1984) (analyzing whether meal periods were so circumscribed as to constitute "hours worked").

But Labor Code Sections 512(e) and (f) expressly exempt from meal period requirements "employee[s] employed in a construction occupation" if "covered by a valid collective bargaining agreement" that:

> expressly provides for the wages, hours of work, and working conditions of employees, and expressly provides for meal periods for those employees, final and binding arbitration of disputes concerning application of its meal period provisions, premium wage rates for all overtime hours worked, and a regularly hourly rate of pay of not less than 30 percent more than the state minimum wage rate.

Those conditions are met here.

Paralleling the Labor Code requirements, Wage Order No. 16 Sections 10(A) and (D) mandate thirty-minute meal periods, which must be paid and counted as time worked unless the worker "is relieved of all duty." Section 10(E) further states that Sections 10(A) and (D):

> shall not apply to any employee covered by a valid collective bargaining agreement if the agreement expressly provides for the wages, hours of work, and working conditions of the employees, and if the agreement provides premium wage rates for all overtime hours worked and a regular hourly rate of pay for those employees of not less than 30 percent more than the state minimum wage.

These conditions are encompassed by those in the Labor Code Section 512(e), and also met here.

Referencing Labor Code Sections 512(e) and (f), the California Court of Appeal has held employers and union-represented employees covered by valid CBAs may bargain over (and perhaps bargain away) the right to off-duty meal periods, *Araquistain v. Pac. Gas & Elec. Co.*, 176 Cal. Rptr. 3d 620, 628 (Ct. App. 2014), because of the "express statutory exemption[s] for CBA-covered employees relating to the . . . right," *Gutierrez v. Brand Energy Servs. of Cal., Inc.*, 264 Cal. Rptr. 3d 173, 183 (Ct. App. 2020) (citing *Araquistain*, 176 Cal. Rptr. 3d at 628; *Vranish v. Exxon Mobil Corp.*, 166 Cal. Rptr. 3d 845, 848–50 (Ct. App. 2014) (permitting union-represented employees covered by valid CBAs to bargain over overtime rights)). But the *Gutierrez* court specifically distinguished between minimum wage rights as compared to off-duty meal period and overtime rights, because "[t]here is no equivalent statutory language" permitting bargaining over minimum wage rights for CBA-covered workers. 264 Cal. Rptr. 3d at 183.

Thus, while it is clear that union-represented employees covered by a valid CBA may bargain over meal period rights, it is less certain if they may bargain away the right entirely, and it is unclear if they may bargain away their right to be paid *minimum wage* for "on-duty" meal periods where they are prohibited from leaving the employer's premises. Huerta contends state law minimum wage protections apply to the time he spent on CSI's premises during time designated as an unpaid meal period under his CBA because he was prohibited from leaving and so was on duty. But CSI asserts this "minimum wage" claim is merely a meal period claim in disguise, and so properly exempted under Labor Code Sections 512(e) and (f) and Wage Order No. 16 Section 10(E).

Whether minimum wage laws proscribe, permit, or otherwise affect unpaid, on-duty meal periods in CBAs under Wage Order No. 16 and Labor Code Sections 512 and 1194, such that a CBA can relinquish the right to minimum wage compensation for on-duty meal periods, has not yet been addressed by California courts. And while the record does not show how many workers are subject to a CBA that provides for unpaid meal periods while prohibiting workers from leaving the employer's premises, the answer to this question will no doubt affect many union-represented workers across California. Thus, we respectfully submit this question to the California Supreme Court for review.

## V.  Accompanying Materials

The clerk of this court is hereby directed to file in the Supreme Court of California, under official seal of the United States Court of Appeals for the Ninth Circuit, copies of all relevant briefs and excerpts of the record, and an original and ten copies of this order and request for certification, along with a certification of service on the parties, pursuant to California Rule of Court 8.548(c)–(d).

This case is withdrawn from submission. Further proceedings before us are stayed pending final action by the Supreme Court of California. The Clerk is directed to administratively close this docket, pending further order. The parties shall notify the clerk of this court within seven days after the Supreme Court of California accepts or rejects certification, and again within seven days if that Court accepts certification and subsequently renders an opinion. The panel retains jurisdiction over further proceedings.

**IT IS SO ORDERED.**